**AMERICAN–LA FRANCE–FOAMITE CORPORATION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 9, Docket 26030.**

United States Court of Appeals Second Circuit.

Argued Nov. 16, 1960.

Decided Dec. 13, 1960.

Lawrence A. Baker, New York City (William W. Karatz, New York City, Winthrop Stimson Putnam & Roberts, New York City, of counsel), for petitioner.

Morton K. Rothschild, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, Department of Justice, Washington, D. C.), for respondent.

Before LUMBARD, Chief Judge, and WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

By petition for review, petitioner, American-La France-Foamite Corporation, seeks to reverse so much of a decision of the Tax Court as denied petitioner a deduction of $506,887.06 in its 1951 income tax included in its return as a worthless debt. As a result of this dis-

---

3. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917; See Holmes v. United States, 4 Cir., 284 F.2d 716.

allowance, a deficiency in income tax of $266,558.13 was assessed.

The sole question presented is whether advances made during the years 1947 [1] to 1951 by petitioner to International Meters, Inc. (IMI) represented capital contributions or loans. If they were loans, they were deductible in 1951, the year of the liquidation of IMI (Section 23(k); if capital contributions, their deduction was limited by Sections 23(g) and 117 of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 23(g), 117.[2]

The necessity for resolving this question (namely, loans or capital contributions) has arisen many times and doubtless will arise many times in the future. The solution of the problem which the courts face in these cases usually is difficult. The situations in which the facts are clear as to whether the advances should fall into one category or the other will rarely reach the courts; only the borderline cases will be litigated. As the Tax Court here quite accurately said, "the matter may not be completely free from doubt" but, since decision is necessary, it must be based upon "our best judgment on the entire record * * *".

The courts have sought to set up several guideposts along the path towards a correct and just decision. Thus, it is said that "the intention of the parties is a major factor in determining the true nature of the relationship" (Jennings v. United States, 7 Cir., 1959, 272 F.2d 842, 843). However, "intention" is often a highly artificial and hypothetical concept because most frequently business ventures originate and are carried on without any clear intent as to tax consequences. If the venture is directed from the start by tax counsel and accountants,

it is likely that the advances will be definitely recognizable as loans or capital contributions. Absent, however, any such direction, the ultimate outcome, the success or failure of the venture, may well dictate a preferred tax treatment which was not intended or even foreseen at the inception of the venture.

The "substance" rather than the "form" of the transaction has frequently been stressed (Commissioner v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Gilbert v. Commissioner, 2 Cir., 1959, 262 F.2d 512, certiorari denied 1959, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030). In final analysis, it is from that composite of all the facts that an attempt must be made to create a probably non-existent intent and to decide in relation to accepted business practices whether the "loan" pan of the scale is heavier than the "capital contribution" pan.

The venture giving rise to this controversy (except for some preliminaries in 1946) commenced in 1947 when petitioner purchased for $50,000 fifty-one percent (51%) of IMI's common stock, 400 shares of preferred stock and a $9,000 note. IMI had been in existence for some six years primarily to exploit a parking meter which by means of two meters on one head could control two parking spaces. The general plan was to have petitioner manufacture the meters and IMI to act as the selling agent. For various reasons the operation did not proceed as rapidly or as successfully as contemplated. IMI had virtually no money during its corporate existence so that all financing had to come from petitioner during the five years of their joint enterprise. Substantial advances were

---

1. The petitioner's books actually show a balance of unpaid advances for 1946 although this amount was included as an item agreed to be paid in the February 21, 1947 agreement.

2. Internal Revenue Code of 1939:
    "§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions: * * *
    "(g) Capital losses.—
    "(1) Limitation.—Losses from sales or exchanges of capital assets shall be al-

lowed only to the extent provided in section 117."
    "§ 117. Capital gains and losses.
    * * *
    "(d) [As amended by Sec. 150(c), Revenue Act of 1942] Limitation on capital losses.—
    "(1) Corporations.—In the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges."

made during these years by petitioner and certain repayments largely from the assignments of meter purchase contracts were received. Nevertheless, the balance against IMI continued to increase.[3] Finally in 1951 the contract between petitioner and IMI was terminated and IMI was liquidated, its assets sold and the proceeds applied against petitioner's account, reducing the balance to the $506,-887.13 here involved.

Although IMI existed as a separate corporation, it was petitioner which made its operations possible. For all practical purposes, the parking meter was just another item petitioner was manufacturing and marketing through a selling agent. Petitioner's stockholders were told that "During the past two years, approximately, we [petitioner] have been developing and testing a new type of parking meter * * *" and "We recently acquired that company [IMI] and will have complete control of its operations."[4] A year later after "We spent $148,700 on the Tavin Parking Meter project in 1947," stockholders were notified that "parking meters are coming off the production line for sales representative purposes and deliveries to customers should start in April."[5] Towards the end, the report advised that "Losses were reduced from $122,535 in 1949 to $42,819 in 1950 and our advances to International Meters, Inc. in 1950 were relatively immaterial."[6]

Petitioner to support a debtor-creditor relationship points to the fact that both petitioner and IMI on their books and financial statements treated the advances as loans; that the advances were not in proportion to the stockholdings and that the advances were partially repaid.

The Commissioner buttresses his stand by asserting that the "loans" were not made to a "going business" but were for the purpose of getting the business going; that no notes were given to evidence the so-called indebtedness; that no time was fixed for repayment; that no interest was charged; and that IMI's financial condition was so weak that repayment was entirely contingent upon the success of the venture.

Petitioner, in turn, cites cases showing that notes, maturity date and certainty of payment are not necessarily determinative. Rowan v. United States, 5 Cir., 1955, 219 F.2d 51, 55; Wallach v. Dryfoos, 1910, 140 App.Div. 438, 440, 125 N.Y.S. 305; Minevitch v. Puleo, 1959, 9 A.D.2d 285, 193 N.Y.S.2d 833; Earle v. W. J. Jones & Son, 9 Cir., 1952, 200 F.2d 846, 851. On their own particular facts, the courts in these cases have found that the weight of evidence justified the conclusion of a debtor-creditor relationship. These cases, however, only serve to create the doubt which the Tax Court said this case is not "completely free from." Yet, viewing in proper perspective the venture from beginning to end, it is difficult to reconcile these large advances, made to a company with no assets of any substance and no prospects other than the success of the venture, as "loans." See John Kelley Co. v. Commissioner, 1946, 326 U.S. 521, 526, 66 S.Ct. 299, 90 L.Ed. 278; see also Gilbert v. Commissioner, 2 Cir., 1957, 248 F.2d 399, 407; Note, Thin Capitalization and Tax Avoidance, 55 Colum.L.Rev. 1054 (1955). The Tax Court has fairly analyzed the evidence and properly concluded that "the deduction for worthlessness of petitioner's investment must be governed by the provisions relating to capital assets rather than by the bad debt provisions."

The decision of the Tax Court is affirmed.

---

3.

| Year | Balance |
| --- | --- |
| 1946 | $ 53,983.80 |
| 1947 | 98,717.20 |
| 1948 | 364,998.57 |
| 1949 | 534,748.24 |
| 1950 | 535,580.10 |
| 1951 | 575,987.08 |

4. Report to Stockholders under date of March 24, 1947.

5. Report to Stockholders under date of March 28, 1948.

6. Report to Stockholders under date of March 23, 1951.